## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**R.Y., a minor child**
3701 Todds Run Foster Road
Williamsburg, Ohio 45176

**HOLLY A. YOUNG**
3701 Todds Run Foster Road
Williamsburg, Ohio 45176
(on her own behalf and on behalf of R.Y.)

**ROBERT D. YOUNG**
3701 Todd Run Foster Road
Williamsburg, Ohio 45176
(on his own behalf and on behalf of R.Y.)

**PLAINTIFFS**

**vs.**

**THE STATE OF OHIO**
c/o Mike DeWine
Ohio Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215

**WENDY GROVE**
Ohio's IDEA Part C Coordinator
Ohio Department of Health
246 N. High Street
Columbus, Ohio 43215
(official capacity)

**CLERMONT COUNTY BOARD OF
DEVELOPMENTAL DISABILITIES**
c/o Superintendent Sharon Woodrow
2040 US Highway 50
Batavia, Ohio 45103

**DEFENDANTS.**

CASE NO. _____

1:12 CV 967

J. BARRETT

**VERIFIED COMPLAINT FOR
TEMPORARY AND PERMANENT
INJUNCTIVE RELIEF, DECLARATORY
RELIEF, AND COMPENSATORY
MONETARY DAMAGES**

**[JURY DEMAND]**

FILED
JOHN P. HEHMAN
CLERK
2012 DEC 18  AM 9: 45
U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

1

## I.   PRELIMINARY STATEMENT

Plaintiff R.Y. is two years old.[1]  R.Y. is a toddler with moderate to severe autism, a significant disability under federal and state law.  R.Y. is being irreparably harmed by the State of Ohio's intentional systemic refusal to honor its early intervention service obligations to the United States and its public trust, statutory, constitutional and other duties to R.Y. and his family ("R.Y." or "the Youngs").

 In August 2011, 16 months ago, R.Y.'s pediatrician suspected that R.Y. had autism and entrusted R.Y.'s life to the State of Ohio and its Help Me Grow program ("State").  Under the auspices of the federal Individuals with Disabilities Education Act (IDEA) Part C,[2] the State had promised the United States that in return for federal funds the State would provide early intervention services to children with disabilities.  Congress established magnificent findings and policy in IDEA Part C:

> (a) Findings—Congress finds that there is an urgent and substantial need—
>
>> *(1)* to enhance the development of infants and toddlers with disabilities, *to minimize their potential for developmental delay*, *and to recognize the significant brain development that occurs during a child's first 3 years of life;*
>> (2) to reduce the educational costs to our society, including our Nation's schools, *by minimizing the need for special education and related services* after infants and toddlers with disabilities reach school age;
>> (3) *to maximize the potential for individuals with disabilities to live independently in society;*
>> (4) to enhance the capacity of families to meet the special needs of their infants and toddlers with disabilities; and
>> (5) to enhance the capacity of State and local agencies and service providers to identify, evaluate, and meet the needs of all children,

---

[1] R.Y. turns three on January 20, 2013.
[2] 20 U.S.C. 1431, *et seq.*

particularly minority, low-income, inner city, and rural children, and infants and toddlers in foster care.

(b) Policy—It is the policy of the United States to provide financial assistance to States—

(1) to develop *and implement* a statewide, comprehensive, coordinated, multidisciplinary interagency system *that provides early intervention services* for infants and toddlers with disabilities and their families;

(2) to facilitate the coordination of payment for early intervention services from Federal, State, local, and private sources (including public and private insurance coverage);

(3) to enhance State capacity *to provide early intervention services* and expand and improve existing early intervention services being provided to infants and toddlers with disabilities and their families; and

(4) to encourage States to expand opportunities for children under 3 years of age who would be at risk of having substantial developmental delay if they did not receive early intervention services.[3]

The accompanying United States Department of Education regulations broadly define early intervention services as developmental services that are provided under public supervision, in collaboration with parents, at no-cost (subject to an exception immaterial to this complaint), and *"designed to meet the developmental needs of an infant or toddler with a disability and the needs of the family to assist appropriately in the infant's or toddler's development . . . [and are] provided in natural environments . . . ."*[4]

Notwithstanding the federal mandate to the State to prepare a proper developmental plan for R.Y. and implement the plan by providing his essential early intervention services, the State failed to inform R.Y.'s family ("the Youngs") that he needed intensive early intervention applied behavior analysis type services, failed

---

[3] 20 U.S.C. 1431 (emphasis added).
[4] 34 C.F.R. 303.13(a) (emphasis added).

to advise the Youngs that applied behavior analysis type services are the only peer-reviewed, scientifically-based methodology for helping R.Y. develop, failed to refer the family to autism specialists able to help R.Y. develop, failed to provide funds so the family could at least secure the services on their own, and, as described below, deprived R.Y. and his family of many procedural and substantive rights under the United States Constitution, federal anti-discrimination statutes, IDEA, and state law.

Shockingly, the Defendants knowingly, intentionally, and unilaterally predetermined that they would not provide R.Y. the essential services he needs. To date, the only response from the State is its summary and cryptic assertion that its official policy is that the State does not make available to disabled children in Ohio intensive early intervention applied behavior analysis type services. Instead, the State is condemning R.Y. to a life that will not be self-sufficient, that will not minimize his need for special education, and that will not maximize his potential to live independently. The developmental time lost to R.Y. due to the State's culpability cannot be regained. R.Y. is being irreparably harmed for life and the harm mounts daily.

This Complaint seeks preliminary and permanent injunctive relief, declaratory relief, and monetary damages for R.Y. and his family.[5]

---

[5] Parenthetically, the Youngs begged the State for relief to help R.Y. even before they had the assistance of a lay advocate earlier this year. The lay advocate (Inclusion Advocates) begged the State for relief for R.Y. when the lay advocate began assisting the family and before they had the assistance of counsel. This counsel begged the State for relief to help R.Y. when he was engaged in this matter in September. All entreaties were rejected by the State.

## II.    PARTIES

1.      R.Y. is a two-year-old with moderate to severe autism residing in Clermont County, Ohio.

2.      Holly A. Young is R.Y.'s mother.  Mrs. Young is a law enforcement officer residing in Clermont County, Ohio.

3.      Robert D. Young is R.Y.'s father.  Mr. Young is a firefighter/paramedic residing in Clermont County, Ohio.

4.       The State of Ohio is a political entity and one of the states constituting the United States of America.  The State receives federal funding for purposes of providing early intervention services to children with disabilities.

5.      Wendy Grove is Ohio's Part C Coordinator in the Ohio Department of Health, Bureau of Early Intervention Services with full oversight of the State's required compliance with IDEA Part C.  Wendy Grove and other State officials with authority to establish the State's policies and practices knowingly limit the content of R.Y.'s developmental plan, knowingly limit the early intervention services they provide to R.Y., and knowingly disregard the developmental risk and irreparable harm to R.Y.

6.      The Clermont County Board of Developmental Disabilities (CCBDD) is one of the entities to which the State of Ohio has delegated the State's obligations under IDEA Part C.   CCBDD is a statutory public body within the State of Ohio created under R.C. Chapter 5126.  CCBDD is operated as a separate administrative and service entity, has an independent board and officers, and has a public contract to work with the State of Ohio with regard to fulfilling the federal IDEA and other mandates intended to benefit young children with disabilities.  CCBDD receives federal funding for purposes of providing early intervention coordination and services to children with disabilities.

CCBDD is authorized by law to have a direct services contract with the Youngs to pay them for developmental services provided to R.Y. CCBDD knowingly limits the content of R.Y.'s developmental plan, knowingly limits the early intervention services it provides to R.Y., and knowingly disregards the developmental risk and irreparable harm to R.Y.

### III.    JURISDICTION

7.    This Court has jurisdiction under 28 U.S.C. 1331, 28 U.S.C. 136I, and 28 U.S.C. 2201, *et seq.*

### IV.    VENUE

8.    Venue is proper in this district.   R.Y. and his family reside in this district and the Defendants are injuring them in this district.

### V.    FACTS

9.    R.Y. has been diagnosed with moderate to severe autism spectrum disorder and encephalopathy.   R.Y. has minimal ability to communicate his wants and needs or follow directions.   He has difficulty with basic attending, imitation, verbal speech, language knowledge, pragmatic/social communication and interactions, behavioral regulation, play skills, age-specific activities for daily living, and consistent, functional use of learned skills across settings and people.

10.    On August 3, 2011, R.Y. was 1½ years old and his pediatrician, Dr. Lynn K. Peters, issued a referral to the State of Ohio Help Me Grow program[6] seeking a

---

[6] "Help Me Grow" is the name of Ohio's statewide prenatal to age three home visiting and early intervention programs overseen and administered by the Ohio Department of Health (Bureau of Early Intervention Services). Ohio Administrative Code 3701-8-01 (GG). According to Help Me Grow's website, the ODH Bureau of Early Intervention Services administers Help Me Grow "with the assistance of state partners from the Ohio Family and Children First Council, Ohio Department of Mental Retardation and Developmental Disabilities and the Family Information Network (FIN) of Ohio .... HMG is administered through 88 county-level offices

determination whether R.Y. qualified for early intervention services. Dr. Peters specifically suspected autism.

11.     The State of Ohio Help Me Grow program unsuccessfully attempted to fulfill its federal IDEA Part C fiduciary responsibilities by first contracting with the Clermont County Family and Children First Council. The Family and Children First Council then conveyed that public trust duty to the Clermont County Board of Mental Health. The Board of Mental Health finally contracted with the Clermont County Board of Developmental Disabilities. The Clermont County Board of Developmental Disabilities unsuccessfully and insufficiently purports to serve R.Y. and his family.[7]

12.     The State of Ohio failed to properly assess R.Y., failed to develop an adequate plan for his development, failed to provide essential early intervention services, failed to inform the Youngs about autism, and generally failed in many material respects to comply with the procedural and substantive requirements of IDEA Part C.[8] As a matter of their official policies and practices, the State and CCBDD intentionally refuse to properly complete IFSPs for infants and toddlers with disabilities and intentionally refuse to provide needed early intervention services to infants and toddlers with disabilities.

13.     Months after R.Y.'s early childhood development had been entrusted to the fiduciary care of the State, and as R.Y. was being irreparably harmed by the State's

---

throughout the state. Through the 88 counties, children and families in every county in Ohio *can access Early Intervention services* .... Numerous agencies throughout the State and Clermont County, as well as parents, work collaboratively to coordinate *and provide* HMG series to children and their families (emphasis added)."

[7] Any reference to "the State" or "Help Me Grow" in this Complaint includes the separate Clermont County Board of Developmental Disabilities. The Defendants are jointly and severally liable for the injuries to R.Y. and his family.

[8] A developmental plan under IDEA Part C is known as an Individual Family Service Plan (IFSP).

failure to properly serve him, the Youngs learned on their own that Cincinnati Children's Hospital included the Kelly O'Leary Center for Autism Spectrum Disorders. The Youngs arranged for R.Y. to be assessed by Children's Hospital and the Kelly O'Leary Center.

14.    In January 2012, Children's Hospital expressed that R.Y. "is demonstrating the combination of features indicative of autism spectrum disorder including impairments in communication, social interaction, and repetitive and stereotyped interests and behaviors." Children's Hospital added that "[i]f at all possible, it is recommended that R.Y. obtain additional speech therapy services. Doing so will provide additional opportunity for developing receptive and expressive language skills." Children's Hospital further emphasized: "R.Y. would be a good candidate for Applied Behavior Analysis (ABA) programming. ABA is an effective treatment for many young children with autism." Children's Hospital recommended 25-40 hours/week of ABA treatment for R.Y.

15.    On February 7, 2012, the Kelly O'Leary. Center completed its extensive evaluation and assessment of R.Y.. The evaluation and assessment from the O'Leary. Center concluded: "Autism, Developmental Delay, Severe Mixed Receptive/Expressive Language Delay." The report added that "[a]utism spectrum disorders are both neurologically and genetically based, and thus reflect an underlying encephalopathy."

16.    Children's Hospital subsequently reiterated that R.Y. "has been diagnosed with autism, developmental delay, and a severe mixed receptive and expressive language disorder . . . . R.Y. had met the criteria for Severe Autism which is further complicated by significantly delayed development." Children's Hospital was emphatic:

8

Many years of evidence-based research studies have proven time and time again that children with severe autism and developmental delay significantly benefit from speech and language therapy, occupational therapy and Applied Behavior Analysis (ABA). The combination of such early interventions are very important for R.Y. in order to specifically address his severe communication disorder, delayed developmental skills, and foster basic principals of social connectedness. *Without these very important treatment interventions, I [Dr. Harriet H. Valentin] feel R.Y. is at risk for failing to develop to his fullest potential and likely would be less independent in functioning later in life as a result.*[9]

17.    Even with all the additional autism assessment information from Children's Hospital, Help Me Grow refused to update R.Y.'s IFSP diagnosis and services, refused to properly modify his IFSP, and continued to impede R.Y.'s right to minimize his developmental delays and maximize the likelihood he would become self-sufficient.

18.    The Youngs continually complained to Help Me Grow that it was not providing proper speech therapy and occupational therapy to R.Y. and that the State's unilateral refusal to provide any intensive early intervention applied behavior analysis treatment to R.Y. was extremely harmful.

19.    The State failed to provide R.Y. a proper initial IFSP, failed to provide R.Y. a proper periodic IFSP, failed to provide R.Y. a proper annual IFSP, and failed to provide a proper modified IFSP for R.Y. each time the family requested modifications. The State both continually refused to provide R.Y. any intensive early intervention applied behavior analysis treatment and refused to reimburse the Youngs even to the very limited extent the Youngs were able to afford procuring any treatment with their own funds.

---

[9] Emphasis added.

20.     The Youngs have been unable to afford procuring any more than minimal and insufficient amounts of applied behavior analysis treatment for R.Y.

21.     Since August 2011 when R.Y. was first entrusted to the State, board-certified providers of applied behavior analysis treatment have been ready, willing, and able to treat R.Y.

22.     The Youngs have met repeatedly with Help Me Grow officials and otherwise communicated on multiple occasions with Help Me Grow officials in order to gain the essential early intervention services R.Y. so desperately needs.  Help Me Grow responded consistently that it would not include those services in R.Y.'s IFSP and would not provide R.Y. those services.

23.     The Youngs had R.Y. assessed again on June 22, 2012, by Trumpet Behavioral Health.  Trumpet Behavioral Health recommended "that R.Y. receives 25-30 hours per week of intensive applied behavior analysis programming which will include systematic teaching of communication.  Programming should be data-driven and monitored by a board certified behavior analyst who can make modifications based on R.Y.'s progress."

24.     Even after trying many months to persuade the State to acknowledge that R.Y. was a child with severe autism and to incorporate the assessment findings and goals of Cincinnati Children's Hospital and Trumpet Behavioral Health into his IFSP, the State remained adamant that it would not do so.

25.     Help Me Grow again informed the Youngs on July 11, 2012, that it does not provide applied behavior analysis therapy, thereby again condemning R.Y. to a life of

developmental delays and dependence, and again imposing on the Youngs the duty to themselves provide these essential highly-skilled early intervention services to R.Y.:

> While these goals are very ABA driven *and we don't provide ABA services*, it looks to me as though the focus is communication (expressive and receptive) and we certainly support working on that area and your priorities. *So, we've taken these Trumpet Behavioral Health ABA goals and tried to rework them into IFSP outcomes that address the fundamentals of what Trumpet Behavioral Health recommended while recognizing the family routines and ways to address these areas in ways that will hopefully be fun and fit into your family routines, and not burdensome for you and your family.*

26.     In August 2012, a full one year after R.Y. was entrusted to State officials, the State still did not provide R.Y. an IFSP with applied behavior analysis type treatment and other services he desperately needs under his IDEA Part C entitlement.

27.     In order to at least maintain the minimum services offered by Help Me Grow the Youngs signed an IFSP in August 2012 and noted their points of disagreement on the document, a common and accepted practice under IDEA as acknowledged by other State officials.

28.     Help Me Grow wrote to the Youngs on August 15, 2012, and plainly acknowledged its lack of familiarity with IDEA Part C federal requirements:

> Since this IFSP has gotten so complex we really had no choice but to ask for guidance from the lead agency, ODH [Ohio Department of Health]. Our county consultant was not sure what to do so she took it to the director of HMG and she had not seen anything of this nature before so she sent it to the legal department. We had a conference call on 8-6-12, with ODH and the head of EI [Early Intervention] at DODD [Department of Developmental Disabilities] and the decision from ODH was that this IFSP is not valid . . . . Therefore we need to start again . . . . *The State told us on 8-6-12 those goals [applied behavioral analysis therapy outcomes] cannot be on the IFSP.*

29.     Help Me Grow told the Youngs on August 22, 2012:

> We have been instructed by the Ohio Department of Health and
> the Ohio Department of Developmental Disabilities, that the IFSP that
> you signed on August 2, 2012 with your 6 points of disagreement is
> not valid . . . . [I]f you have disagreements with part of the IFSP, you
> disagree with the entire document . . . . [Help Me Grow] cannot
> continue to provide services until the IFSP is updated and signed."

30.     In fact, Help Me Grow completed its retaliation by withdrawing R.Y.'s
services on August 23, 2012, over the Youngs' objection.

31.     By contrast, on August 21, 2012, an IDEA Part B State of Ohio official
had informed the Youngs that "[U]nder Part B of the IDEA a parent may disagree with
portions of an IEP [Individualized Education Program] *and still have those items that are
not in disagreement implemented*." Help Me Grow has inexplicably and inexcusably
deprived R.Y. of his "stay-put" right to have undisputed early intervention services
maintained.

32.     Help Me Grow emphatically informed the Youngs on August 28, 2012:
"The state of Ohio has not opted to pay for ABA services as a specific service delivery
approach . . . ."

33.     Help Me Grow even refused to attend R.Y.'s transition meeting with his
school district telling the Youngs "unless we have a signed IFSO we cannot do that . . . ."

34.     Even though Help Me Grow had already terminated services to R.Y.
because the Youngs would not sign a deficient IFSP, Help Me Grow sent the Youngs a
letter and an email again advising the Youngs that R.Y. would be exited from IDEA Part
C unless the Youngs signed a different IFSP. The Youngs were out-of-town when the
letter and email were delivered. They did not receive the communications until after they
had returned home (after the date Help Me Grow once again unilaterally terminated
R.Y.).

35.     Proper prior written notice must be in sufficient detail to inform parents about the action being taken by the State, the reasons for the action, and all procedural safeguards available to the parents.  Since the time his pediatrician first entrusted R.Y.'s developmental needs to the Help Me Grow program in August 2011, the State never provided proper prior written notice to the Youngs that the State had unilaterally and categorically predetermined to exclude intensive early intervention applied behavior analysis type services or the reason for that unilateral predetermination.  The State's failure to provide proper prior written notice also deprived the Youngs of all their significant procedural rights under IDEA.

36.     Beginning August 2011, the State's conduct with regard to R.Y.'s welfare has been egregiously culpable.  The elapsed time between R.Y.'s referral to the State's Help Me Grow program and the continued delay in commencement of proper intensive intervention has irreparably injured R.Y. by limiting his future development.  There are few more critical periods of development in a child's growth equaling the trajectory between 18 months and three years.

37.     The entire concept of early intervention services established by the United States Congress is based around an early period of development, particularly for children with autism.

38.     Intensive early intervention for young children with autism allows them to "catch-up" to peers to the greatest extent possible and lay the foundation for learning, paying attention, speaking, filtering distractions, and becoming part of the world.

39.     There is no legitimate professional or legal reason why R.Y. was not provided intensive early intervention services by the State of Ohio within one month of

13

his referral to the State. Given the State's delay in implementing intensive early intervention services for R.Y., his development has been substantially and permanently diminished and that injury to R.Y. increases daily.

40.     Due to the loss of critical periods of learning caused by the State's refusal to provide R.Y. his essential early intervention services, R.Y.'s condition of autism is more urgent now than in August 2011. R.Y. needs immediate and extra-intensive services to have any opportunity at all to recoup some of what was neurologically lost due to the State's culpability. He needs immediate and extra-intensive services to aid his communication, cognition, socialization, motor development (fine and gross), and self-help skills.

41.     On June 27, 2012, the United States Department of Education, Office of Special Education and Rehabilitative Services, wrote to the State of Ohio to inform the State: "Ohio needs assistance in implementing the requirements of Part C of IDEA."

42.     On December 14, 2012, in response to a query from this counsel, USDOE expressed its concern that Ohio's and CCBDD's official policies and practices violated IDEA Part C in a manner directly injurious to R.Y. USDOE wrote to Defendant Wendy Grove and the State:

> This letter is to request that Ohio review its policies in two areas . . . under Part C of the Individuals with Disabilities Education Act (IDEA). These two areas are part of the State policies that must be on file with the Office of Special Education Programs (OSEP) under Section II.A. of Ohio's IDEA Part C grant application under 34 CFR §§303.13 and 303.203(a).

> The first request is that Ohio clarify how its definition of 'early intervention services' in Ohio [Administrative Code] rule 3701-8-01(S) is consistent with the Federal definition, *because the State's definition does not expressly provide that its list of 'early intervention services' is not exhaustive, as required by 34 CFR §303.13(d). The*

*second request is that Ohio clarify if its State policies in Ohio Rule 3701-8-01 include all of the requirements regarding qualified personnel set forth in 34 CFR §303.13(c) and (d).*[10]

43.    34 C.F.R. 303.344(d) requires that each disabled child's IFSP include the early intervention services necessary to meet the unique needs of the child and family and achieve the results or outcomes identified in the IFSP.

44.    The State of Ohio is required to ensure that necessary early intervention services are available and are provided to each disabled child.

45.    In return for receiving millions of dollars in federal funding for IDEA Part C services, the State of Ohio represented to the United States that it "ensures that appropriate early intervention services based on scientifically based research, to the extent practicable, are available to all infants and toddlers with disabilities and their families."

46.    Applied behavior analysis type treatment is the only peer-reviewed, scientifically based methodology for helping a child with severe autism increase his potential to become self-sufficient.

47.    Congress requires states to expedite and maintain early intervention services to children with disabilities. Even if there is a dispute between a family and a state, the child remains entitled to continue receiving the early intervention services that are not in dispute.

48.    Congress requires states to provide proper prior written notice when a state declines to initiate or refuses appropriate early intervention services.

---

[10] Email from Brenda Wilkins, USDOE, Office of Special Education and Rehabilitation Services, Monitoring and State Improvement Planning Division, to Wendy Grove (emphasis added).

49. The federal funds provided to Ohio under IDEA Part C may be used for direct early intervention services for infants and toddlers with disabilities and their families.

50. Federal law broadly defines early intervention services to be developmental services that include applied behavior analysis type treatment either as "special instruction," or "other services," or another category of early intervention services.

51. Early intervention services must be provided to infants and toddlers with disabilities and their families in a timely manner.

52. The federal government is so concerned about each disabled child's welfare that it requires a prompt initial IFSP, a periodic IFSP, an annual IFSP, and other IFSP reviews at the family's request. The purpose of this frequent review is to determine whether the IFSP has been successful or whether the IFSP's results, outcomes, or early intervention services need modification.

53. Other deficiencies in the State of Ohio's handling of R.Y.'s welfare include, but are not limited to, failing to require attendance of all necessary persons at R.Y.'s IFSP meetings, inadequate IFSPs with regard to present levels of development and measurable outcomes, and failing to identify the peer-reviewed necessary services for children with autism.

54. Pursuant to 34 C.F.R. 303.440, *et seq.*, on October 30, 2012, R.Y. and the Youngs filed with the Ohio Department of Health what is called a "due process complaint" seeking "compensatory services" from the State of Ohio. Compensatory services are a remedy designed to provide the services R.Y. *now* needs to partially

overcome the harm caused by the State's ongoing failure to provide proper services to R.Y. in the first place. The administrative complaint is pending and the hearing is scheduled to begin January 14, 2013. The hearing officer for the administrative proceeding does not have authority to hear the claims presented in this Complaint or the authority to order preliminary relief, compensatory damages, or the other remedies requested in this Complaint. This Complaint does not seek to interfere with the administrative proceeding and it is unnecessary for the Court to do so. Because R.Y. is being irreparably injured now, and because the hearing officer in the administrative proceeding has no authority to award either injunctive relief or compensatory monetary damages for permanent injuries and pain and suffering, it would be futile for this Court to await a ruling from the administrative hearing officer. Furthermore, the administrative hearing officer will not be determining R.Y.'s ongoing IFSP needs because, beginning January 20, 2013, R.Y. will have transitioned into IDEA Part B and the jurisdiction of his local school district. The Youngs are currently having discussions with the local school district to formulate R.Y.'s prospective Individualized Education Program (IEP).

55. R.Y. also seeks emergency relief in this Court because the State has violated the "stay-put" provisions in IDEA Part C by refusing to continue providing R.Y. already agreed services while his due process complaint is pending.

56. The United States Department of Justice, on behalf of the United States Department of Education,[11] advocates that where a child with a disability no longer has

---

[11] The United States Department of Education is charged with issuing regulations implementing IDEA's procedural protections and issuing policy letters and other interpretive guidance. The Department of Justice may bring actions to enforce the IDEA. In its *amicus curiae* brief filed in the *en banc* Ninth Circuit case *Payne, et al. v. Peninsula School District, et al.*, 653 F.3d 863 (9th Cir. 2011) (a case essentially

an ongoing education dispute capable of remediation in an administrative proceeding and the child claims unconstitutional deprivation, a judicial remedy should be immediately available. Where a child with a disability seeks retrospective compensation or emergency relief from denial of "stay-put," like R.Y. in the case at bar, the Department of Justice takes the position that the child does not need to engage in the futile exercise of an administrative proceeding. DOJ is emphatic: "Congress had no intent to require a litigant suing under another law, and not seeking any remedy available under the IDEA, to go through the IDEA administrative process." Citing the House Report accompanying passage of the relevant IDEA provision, DOJ noted: "And even then, Congress intended that exhaustion not be required in certain circumstances, such as where 'it would be futile to use the due process procedures' or 'the hearing officer lacks the authority to grant the relief sought.'"

57. The Youngs have been, and remain, unable to afford the essential types and levels of early intervention services that R.Y. needs in order to develop. Since August 2011, the Youngs have only been able to intermittently procure very limited and insufficient services for R.Y. The Youngs have exhausted all financial means available to them including loans, credit cards, family and friends, and grants. They are on the brink of filing for bankruptcy. Trying to assist R.Y. in the manner he needs without proper

---

adopting the position advocated by the United States), the Department of Justice emphasized that "IDEA remedies are not designed to redress the damage alleged in this case . . . [from unconstitutional conduct]." The Department of Justice asserted that compensatory services (that may possibly be ordered by the administrative hearing officer in a due process proceeding) "hardly compensates for the pain inflicted" and "no prospective [IDEA] services can undo the sort of trauma alleged here." DOJ also indicated that "a plaintiff seeking emergency relief under the IDEA's stay-put provision need not exhaust administrative remedies first," citing *N.D. v. State Dep't of Educ.*, 600 F.3d 1104, 1111 (9th Cir. 2010).

help from the Defendants has pushed the Youngs to their financial, emotional, and physical limits. There is a very large difference between the amount of intensive early intervention applied behavior analysis type treatment and other services R.Y. desperately needs now and the much lower and inadequate amount that the Youngs currently procure (paid by a partial short-term grant that expires next month). There is a significant difference between the amount of occupational therapy R.Y. needs and the amount he currently receives. R.Y. is not currently receiving even any of his essential speech therapy. The annual cost of R.Y.'s essential early intervention services exceeds the Youngs' gross annual income (before taxes, mortgage, car payments, utilities, insurance, food, etc.).

58. R.Y. immediately needs the following essential early intervention services in order to stop the irreparable harm to his brain and his life: 40 hours/week direct intervention and six hours/week indirect intervention. The 40 hours/week direct intervention consists of 33 hours of hands-on intensive behavioral instruction delivered by trained in-home tutors, four hours intensive behaviorally designed speech and language intervention, and three hours behaviorally designed occupational therapy. The six hours/week indirect intervention consists of four hours/week of clinical consultation provided by a board certified behavior analyst and two hours/week case management/team meetings including the behavioral consultant, speech therapist, occupational therapist, lead tutor, and parents.

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION: DENIAL OF PROCEDURAL
### DUE PROCESS (42 U.S.C. 1983)

59.    The Youngs incorporate the preceding paragraphs into their First Cause of Action.

60.    A child with a disability has a legitimate claim of entitlement under IDEA Part C and Ohio law to early intervention services necessary to achieve the purpose of helping maximize the potential for self-sufficiency and reducing society's need to support the child in the future.

61.    When Ohio applied for and accepted federal funds under IDEA Part C Ohio committed to the United States and the citizenry of the State of Ohio that it would provide needed early intervention services to children with disabilities.

62.    Under federal and Ohio law, the State does not retain discretion to deny R.Y. and his family their access to needed IDEA Part C early intervention services.

63.    The applicable federal regulations adopted by the State of Ohio provide the Youngs a post-deprivation remedy, *i.e.*, an administrative due process hearing.  Ohio does not provide the Youngs a pre-deprivation remedy.  A post-deprivation remedy is inadequate to constitute sufficient procedural due process protection for R.Y. and his family because every day R.Y. is deprived of essential intensive early intervention applied behavior analysis type treatment he is irreparably injured.  His brain's development cannot recover from the time lost due to the State's official systemic refusal to provide R.Y. his treatment.  A possible award at some point in time of "compensatory services" in a due process proceeding will not allow R.Y. to ever regain the development

status he would have achieved had the State timely provided R.Y. his essential early intervention services.

64.     The State's intentional systemic failure to provide R.Y. and the Youngs a pre-deprivation remedy prior to denying R.Y. essential intensive early intervention applied behavior analysis type treatment not only denied R.Y. and his family their rights under IDEA Part C but also deprived them of their constitutional right to procedural due process.

65.     The State's unilateral act of exiting R.Y. from eligibility for IDEA Part C services without proper prior written notice also deprived R.Y. of a pre-deprivation remedy thereby violating the Youngs' rights under IDEA Part C but also their constitutional right to procedural due process.

## SECOND CAUSE OF ACTION: DENIAL OF EQUAL PROTECTION OF THE LAWS (42 U.S.C. 1983)

66.     The Youngs incorporate the preceding paragraphs into their Second Cause of Action.

67.     The State's systemic denial of intensive early intervention applied behavior analysis type treatment to children with autism who desperately need that essential service not only violates IDEA Part C it is also arbitrary and capricious.

68.     The State has no rational reason for providing needed early intervention services to some children with disabilities but arbitrarily and capriciously denying intensive early intervention applied behavior analysis type treatment to children with autism.

69.     To date, the State has not provided any reason whatsoever for its systemic denial of early intervention applied behavior analysis type treatment to children with

autism who need that service and who cannot have any chance to fulfill their development potential without it.

70.     The State's denial of intensive early intervention applied behavior analysis type treatment to children with autism is a "class of one" equal protection deprivation and/or a traditional equal protection deprivation.

## THIRD CAUSE OF ACTION: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. 794)

71.     The Youngs incorporate the preceding paragraphs into their Third Cause of Action.

72.     The State of Ohio knows that children with severe autism require intensive early intervention applied behavior analysis type treatment in order to enable the children to have any opportunity at all to fulfill the purpose of IDEA Part C and allow the children to minimize their potential for developmental delay, minimize their need for special education and related services, and maximize their potential to live independently in society.

73.     Notwithstanding that knowledge, the State of Ohio intentionally deprives children with severe autism, including R.Y., of intensive early intervention applied behavior analysis type treatment.

74.     The State's knowing and intentional conduct constitutes, at a minimum, deliberate indifference to the rights of R.Y. and his family.

75.     The State's unilateral and categorical elimination of essential intensive early intervention applied behavior analysis type treatment from R.Y.'s IFSP discriminates against R.Y. based solely on his autism disability and deprives R.Y. of meaningful access to or benefit from Part C early intervention services.

76.     The State of Ohio's Help Me Grow program, including the Clermont County Board of Developmental Disabilities, receives federal funds under IDEA Part C for its Help Me Grow program.  The State and CCBDD fall within the scope of the proscriptions in Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.

## FOURTH CAUSE OF ACTION: VIOLATION OF PART C OF THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT (20 U.S.C. 1431, et seq.)

77.     The Youngs incorporate the preceding paragraphs into their Fourth Cause of Action.

78.     The State failed to properly evaluate and assess R.Y. beginning in August 2011 when R.Y.'s developmental care was first entrusted to the State.

79.     The State failed to prepare and implement any proper IFSPs for R.Y.

80.     The State failed to provide any proper prior written notice to the Youngs apprising them of the State's refusal to serve R.Y.'s needs and of the Youngs' procedural rights.

81.     The State failed to provide complete, accurate, and timely periodic and annual reviews of R.Y.

82.     The State failed to require attendance of all necessary parties at R.Y.'s IFSP meetings.

83.     The State unilaterally and categorically predetermined that it would exclude intensive early intervention applied behavior analysis treatment from R.Y.'s early intervention services.

84.     The State failed to provide R.Y. adequate speech therapy and occupational therapy.

23

85.     The State failed to provide R.Y.'s early intervention services in his natural environment and failed to provide R.Y. acknowledged peer-reviewed services.

86.     The State failed to provide qualified service coordinators to assist R.Y.

87.     The State failed to provide "stay-put" and maintain R.Y.'s undisputed services when his family noted its points of disagreement on his IFSP and while his due process complaint was pending.

88.     The State failed to properly assist R.Y. during his transition to IDEA Part B and his school district.

89.     The Youngs do not request that this Court develop an IFSP for R.Y. or order "compensatory services" within the scope of the administrative hearing examiner's jurisdiction.  Rather, the Youngs plead these IDEA violations to demonstrate the depth and breadth of the State's culpability in fulfilling this highest public trust responsibility concerning IDEA Part C and the welfare of children with disabilities.   The State's failure to provide "stay-put" for R.Y. and maintain his services is, nevertheless, an IDEA violation that must be immediately and directly enjoined by the Court at this time.

## FIFTH CAUSE OF ACTION: VIOLATION OF TITLE II, AMERICANS WITH DISABILITIES ACT  (42 U.S.C. 12101, *et seq.*)

90.     The Youngs incorporate the preceding paragraphs into their Fifth Cause of Action.

91.     The State of Ohio's Help Me Grow program, including the Clermont County Board of Developmental Disabilities, is subject to the proscriptions in the Americans with Disabilities Act.

92. The State of Ohio knows that children with severe autism require intensive early intervention applied behavior analysis type treatment in order to enable the children to have any opportunity at all to fulfill the purpose of IDEA Part C and allow the children to minimize their potential for developmental delay, minimize their need for special education and related services, and maximize their potential to live independently in society.

93. Notwithstanding that knowledge, the State of Ohio intentionally deprives children with severe autism, including R.Y., of intensive early intervention applied behavior analysis type treatment.

94. The State's knowing and intentional conduct constitutes, at a minimum, deliberate indifference to the rights of R.Y. and his family.

95. The State's unilateral and categorical elimination of essential intensive early intervention applied behavior analysis type treatment from R.Y.'s IFSP discriminates against R.Y. based solely on his autism disability and deprives R.Y. of any meaningful access to beneficial early intervention services.

## SIXTH CAUSE OF ACTION: UNLAWFUL RETALIATION UNDER SECTION 504 OF THE REHABILITATION ACT OF 1973, THE AMERICANS WITH DISABILITIES ACT, AND PART C OF THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT

96. The Youngs incorporate the preceding paragraphs into their Sixth Cause of Action.

97. The State's actions with regard to terminating R.Y.'s services after the Youngs exercised their right to agree to part of R.Y.'s IFSP, but note their points of disagreement, was unlawful retaliation in violation of Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, and IDEA Part C.

98.     The State's actions with regard to unilaterally exiting R.Y. from its Help Me Grow program after the Youngs exercised their right to agree to part of R.Y.'s IFSP, but note their points of disagreement, was unlawful retaliation in violation of Section 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act, and IDEA Part C.

## SEVENTH CAUSE OF ACTION: BREACH OF CONTRACT

99.     The Youngs incorporate the preceding paragraphs into their Seventh Cause of Action.

100.    R.Y. and his family are the third-party beneficiaries of the agreement between the State of Ohio and the United States to provide necessary IDEA Part C early intervention services to children with disabilities in Ohio.

101.    In that agreement, the State of Ohio assured the United States that the State would properly plan for and provide necessary IDEA Part C early intervention services to R.Y. and his family.  Notwithstanding that assurance to the United States, the State of Ohio adopted an official unlawful policy limiting early intervention services thus breaching its promise to the United States and R.Y. and thereby causing immediate and irreparable injury to R.Y. and his family.

## EIGHTH CAUSE OF ACTION:  BREACH OF PUBLIC TRUST FIDUCIAR.Y. DUTY

102.    The Youngs incorporate the preceding paragraphs into their Eighth Cause of Action.

103.    The State of Ohio has the highest public trust fiduciary duty: Advancing the welfare of children with disabilities with a view toward minimizing their prospective dependence on public resources and maximizing the likelihood they will have self-sufficient lives.

104. For reasons that remain inexplicable, the State has breached its public trust fiduciary duty to R.Y. Young and his family and, indeed, other young children with disabilities and their families.

105. The State's breach of its public trust fiduciary duty caused R.Y. and his family immediate and irreparable harm.

## VII.   **PRAYER FOR RELIEF**

Plaintiffs R.Y., Holly Young, and Doug Young pray for:

1. Immediate injunctive relief ordering the State of Ohio to provide R.Y. "stay-put" and maintain R.Y.'s undisputed early intervention services while the Youngs' due process complaint is pending before the administrative hearing officer.

2. Immediate injunctive relief ordering the State of Ohio to cease categorically excluding intensive early intervention applied behavior analysis type services from R.Y. and ordering the State to provide R.Y. 40 hours/week direct intervention and six hours/week indirect intervention. The 40 hours/week direct intervention consists of 33 hours of hands-on intensive behavioral instruction delivered by trained in-home tutors, four hours intensive behaviorally designed speech and language intervention, and three hours behaviorally designed occupational therapy. The six hours/week indirect intervention consists of four hours/week of clinical consultation provided by a board certified behavior analyst and two hours/week case management/team meetings including the behavioral consultant, speech therapist, occupational therapist, lead tutor, and parents.

3. A declaration that the State of Ohio systemically violates the rights of infants and toddlers with disabilities when it unilaterally and categorically excludes certain intensive early intervention services from the children's IFSPs and refuses to provide the services.

4. Compensatory damages for R.Y. in an amount exceeding one million dollars for the lifelong diminution in his brain's ability to function due to the State's culpability with regard to failing to provide early intervention services to R.Y.

5. Compensatory damages for R.Y. in an amount exceeding one million dollars for the lifelong diminution in R.Y.'s neurological ability to psychologically, sociologically, and economically prosper due to the State's culpability with regard to failing to provide early intervention services to R.Y., and related pain and suffering.

6. Compensatory damages to Holly and Doug Young in an amount exceeding one million dollars for the lifelong loss of consortium, emotional distress, pain and

suffering, and other injuries to them caused by the State's culpability with regard to failing to provide early intervention services to R.Y.

7. Attorney's fees, expert witness fees, and costs.

8. Such other relief the Court deems just and proper.

Respectfully submitted,

Richard Ganulin (0025642)
Attorney at Law
3662 Kendall Avenue
Cincinnati, Ohio 45208
(513) 405-6696
rganulin@gmail.com

**PLAINTIFFS DEMAND TRIAL BY JURY**

## VERIFICATION

State of Ohio      )

County of Clermont   )

Holly A. Young, Plaintiff in this matter and mother of R.Y., being duly sworn, says that the factual allegations contained in this Complaint are true to the best of her knowledge.

_____

Taken, sworn to and subscribed before me this __17th__ day of December, 2012.

_____Notary Public

MARSHA LEE GARNER
Notary Public, State of Ohio
My Commission Expires,
Sept. 4, 2017